# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 2, 2026

Lyle W. Cayce
Clerk

No. 25-60269

United States of America,

*Plaintiff—Appellant*,

*versus*

Lexus Sanchez Weaver,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 1:24-CR-110-1

_____

Before Jones, Duncan, and Douglas, *Circuit Judges*.

Edith H. Jones, *Circuit Judge*:

The district court suppressed evidence found in Appellee Weaver's home pursuant to a search warrant and incriminating statements he made during a police interview.  We REVERSE and REMAND.

## BACKGROUND

In March 2024, law enforcement officers executed a search warrant at Weaver's home in Starkville, Mississippi.  Officer Garrett Mittan requested this warrant from Municipal Court Judge Brian Kelley.  Officer Mittan drafted the supporting affidavit, which outlined a series of three controlled

No. 25-60269

drug buys using a confidential informant ("CI"). The affidavit asserted that the CI was reliable based on the officers' prior experience with him, and the CI was knowledgeable regarding the appearance, transportation, and use of controlled substances. For each controlled buy, the affidavit stated that within a specific date range,

> CI at the direction and surveillance of [Officer Mittan] and other law enforcement personnel purchased an undisclosed amount of crack cocaine from Lexus Weaver at [address]. Prior to and after each purchase, CI was searched for money and contraband with none being found. CI was under continuous surveillance by law enforcement prior to each purchase, during each purchase, and after each purchase until CI was again searched for money and contraband with none being found.

The affidavit also noted a conversation that occurred among the CI, Weaver, and a third individual identified by name and the make and model of the vehicle driven by Weaver.

Judge Kelley approved the search warrant via FaceTime with Officer Mittan.[1] It is unclear whether Judge Kelley placed Officer Mittan under oath during this call. He signed Judge Kelley's name and his own name and wrote "via facetime" per Judge Kelley's instructions. Judge Kelley then sent an approval text message to Officer Mittan following the call.

When police searched Weaver's residence, they collected methamphetamine, cocaine, firearms, money, and cellphones. Weaver was arrested and brought to the station for questioning.

---

[1] This practice began during the COVID-19 pandemic after the Mississippi Supreme Court issued an Emergency Order providing for videoconferencing as a means for judges to approve search and arrest warrants. This Emergency Order was briefly rescinded before it was reinstated by another Order. When Judge Kelley approved Officer Mittan's search warrant, the Order was still in effect.

2

No. 25-60269

Weaver's interview was captured on video. Officer Mittan, accompanied by another officer, began by telling Weaver that they wanted to discuss what happened at his home. Officer Mittan asked about Weaver's contact information and then proceeded to address the "constitutional protections." He placed a form in front of Weaver and read the listed *Miranda* rights while pointing to each right.[2] He asked if Weaver understood, and Weaver responded in the affirmative. Officer Mittan then requested that Weaver sign the form: "All right, if you'll just sign right there, that's just saying that I read that to you." Weaver appeared not to read the form, but he signed it.

Below the *Miranda* rights list was a "Waiver of Rights" section, stating:

> I (have read) or (had read to me) this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Officer Mittan did not read this section aloud or otherwise mention waiver. Weaver spoke with the officers for about one hour and appeared calm and cooperative.

Based on the evidence collected from his home and his statements, Weaver was indicted on five counts involving drug trafficking and firearm

---

[2] "You have the right to remain silent. Anything you say can and will be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer."

possession. Weaver moved to suppress the evidence from the search and his statements. After holding a suppression hearing, the district court granted Weaver's motion. The government timely appealed.

## STANDARD OF REVIEW

When reviewing a district court's ruling on a motion to suppress, we review factual findings for clear error and legal conclusions *de novo*. *United States v. Norman*, 129 F.4th 874, 876 (5th Cir. 2025) (citing *United States v. Cavazos*, 288 F.3d 706, 709 (5th Cir. 2002).

## DISCUSSION

On appeal, the government argues that the district court erred by suppressing the evidence discovered at Weaver's home and Weaver's statements made during his interview with law enforcement. We address each suppression in turn.

### I. Evidence from the Search

Courts analyze a motion to suppress evidence gathered pursuant to a search warrant in two steps. *United States v. Payne*, 341 F.3d 393, 399 (5th Cir. 2003). First, the court considers whether the good-faith exception to the exclusionary rule applies. *Id.* Second, the court considers the question of probable cause. *Id.* If the good-faith exception applies, the court need not reach the second step unless it presents a "novel question of law," the resolution of which is "necessary to guide future action by law enforcement officers and magistrates." *Id.*

"Under the good-faith exception, evidence obtained during the execution of a warrant later determined to be deficient is admissible nonetheless, so long as the executing officers' reliance on the warrant was objectively reasonable and in good faith." *Id.* (citing *United States v. Leon*, 468 U.S. 897, 921–25, 104 S. Ct. 3405, 3419–22 (1984)). "For purposes of

the good-faith exception, we review the district court′s evaluation of officers′ objective reasonableness *de novo*.” *Id.* This analysis “will ordinarily depend on an examination of the affidavit,” but “all of the circumstances [surrounding issuance of the warrant] may be considered.” *Id.* at 400 (alteration in original).

The exception does not apply, meaning reliance on the warrant is unreasonable, in four circumstances:

> 1) the magistrate issued [the warrant] based on information the affiant knew was false or should have known was false but for reckless disregard of the truth; 2) the magistrate wholly abandoned the judicial role; 3) the warrant is based on an affidavit so lacking in probable cause as to render belief in its existence unreasonable; and 4) the warrant is facially deficient in particularizing the place to be searched or things to be seized.

*United States v. Morton*, 46 F.4th 331, 336 (5th Cir. 2022) (en banc). The third circumstance is at issue in this case. Such “bare bones” affidavits contain “wholly conclusory statements,” lacking “the facts and circumstances from which a magistrate can independently determine probable cause.” *Norman*, 129 F.4th at 876. These affidavits “do not detail any facts, they allege only conclusions.” *Id.*

The district court held that Officer Mittan’s supporting affidavit was bare bones. It took issue with the affidavit’s “boilerplate” language, the lack of indication that the drugs were authenticated, and the failure to corroborate the informant’s tip or reliability. Overall, the district court determined that the affidavit lacked sufficient detail to justify good-faith reliance.

No. 25-60269

The district court's conclusions are poor footing for its decision to suppress.[3]    First, boilerplate language does not "undermine the reasonableness of reliance on the warrant" when there is "more," as is the case here. *United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996). Second, although Officer Mittan's procedures could have benefitted from drug authentication, that is not the minimum requirement of this court. *See Waltman v. Payne*, 535 F.3d 342, 347–48 (5th Cir. 2008) (determining that officers did not lack probable cause to seize drugs even after the field test was negative); *United States v. Delacruz*, 452 F. App'x 461, 462 (5th Cir. 2011) (determining that officers did not lack probable cause to seize drugs that were not tested when officers had experience investigating drug crimes and the defendant did not cite any case law mandating officers field test drugs). Third, the affidavit does not merely rely on a CI's tip such that other facts supporting CI reliability are warranted.    The officers performed an investigation *based on* the CI's tip, and it was this investigation—three controlled buys using the CI subject to continuous surveillance by law enforcement—that formed the basis of the affidavit. *See United States v. Pena-Rodriguez*, 110 F.3d 1120, 1131 (5th Cir. 1997) ("Taken together, the information provided by [CI] and the contemporary, corroborative evidence gathered by the government were sufficient for a reasonable officer to believe that the challenged warrant was based on probable cause."); *United States v. Mays*, 466 F.3d 335, 344 (5th Cir. 2006) (holding that an affidavit "contained

---

[3] The district court erroneously expressed disapproval of Judge Kelley's warrant procedure.  Judge Kelley's approach may not have been ideal, but he used FaceTime in compliance with a state Supreme Court's still-effective Emergency Order.  Further, even if Judge Kelley did not place Officer Mittan under oath, the officer signed the warrant affidavit and certified that its information was true and correct under penalty of perjury. "Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Leon*, 468 U.S. at 921, 104 S. Ct. at 3419.

sufficient indication of the informant's reliability" because "controlled buys later proved [the informant's tip] to be true" and law enforcement "independently corroborated it through . . . surveillance").

Finally, the affidavit contained sufficient detail: time frames of the drug buys; the address of Weaver's residence; the type of drug; the controlled buy process; a conversation among the CI, Weaver, and a named third individual; and the make and model of a vehicle driven by Weaver. The affidavit is unlike bare bones affidavits previously identified by this court. In *United States v. Barrington*, the affidavit "stated *only* that [the officer] 'received information from a confidential informant' who is 'known to [the officer] and has provided information in the past that has led to arrest and convictions." 806 F.2d 529, 531 (5th Cir. 1986) (emphasis added). In *Spencer v. Staton*, the affidavit was a "textbook example" of bare bones, "reciting [the defendant's] biographical and contact information" and "stating nothing more than the charged offense, accompanied by a conclusory statement" that the defendant assisted in evading authorities. 489 F.3d 658, 661–62 (5th Cir. 2007), *withdrawn in part on reh'g* (July 26, 2007). The affidavit drafted by Officer Mittan includes much more detail than was included in those cases, and it went far beyond conclusory statements relying on a CI or mere indications of the offense committed.

Officer Mittan's affidavit more closely resembles the affidavits found to be sufficient for the good-faith exception. In *Broussard*, the affidavit identified those involved in drug trafficking by name, the type of drugs, the car used, and ultimately, the officers' observations of the suspects' movement and drug transactions. 80 F.3d at 1035. In *United States v. Morton*, the affidavit detailed the defendant's arrest and discovery of drugs and his phones, noting where the drugs and drug paraphernalia were discovered and the implications of the findings due to the affiant's training and experience. 46 F.4th 331, 337 (5th Cir. 2022). In *United States v. Norman*, the affidavit

included text messages by the defendant and information regarding the defendant's drug transactions and movements.  129 F.4th 874, 876 (5th Cir. 2025).

Comparing the warrant here with other cases, "[w]hatever one might conclude in hindsight about the strength of the evidence it recounts, the affidavit is not 'wholly conclusory.'"  *Morton*, 46 F.4th at 337.  Accordingly, the good-faith exception applies.  "And because the good-faith exception applies, 'our analysis ends' and 'we need not reach the question of probable cause.'"  *Norman*, 129 F.4th at 877 (quoting *United States v. Cavazos*, 288 F.3d 706, 709 (5th Cir. 2002); *see also Morton*, 46 F.4th at 339 ("We do not decide if the state judge should have authorized [the search] based on these affidavits.  We decide only that the officers acted in good faith when relying on the judge's decision to issue the warrants.").

## II.  Weaver's Statements

Due to the "inherently coercive nature of a custodial interrogation," the prosecution may not use a defendant's statements during an interrogation unless the proper procedural safeguards were employed to secure the privilege against self-incrimination.  *United States v. Cardenas*, 410 F.3d 287, 292 (5th Cir. 2005).  Once these safeguards are in place, customarily by the recitation of *Miranda* warnings, a suspect may waive his *Miranda* rights.  *Id.* The validity of this waiver has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Id.* at 293.

"The voluntariness determination is made on a case-by-case basis and is viewed under the totality of the circumstances surrounding the interrogation." *Id.* A "crucial aspect" of voluntariness is "the presence or absence of coercive behavior on part of the government." *Id.* "[T]rickery or deceit is only prohibited to the extent it deprives the suspect 'of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.'" *United States v. Alvarado-Palacio*, 951 F.3d 337, 341 (5th Cir. 2020) (alteration in original) (quoting *Soffar v. Cockrell*, 300 F.3d 588, 596 (5th Cir. 2002)).

"[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination." *Berghuis v. Thompkins*, 560 U.S. 370, 383, 130 S. Ct. 2250, 2261 (2010). However, this heavy burden is satisfied by a preponderance of the evidence. *Id.* at 384, 130 S. Ct. at 2261.

A *Miranda* waiver may be express or implied. *See id.* "[A] waiver of *Miranda* rights may be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" *Id.* (quoting *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S. Ct. 1755, 1757 (1979)). "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Id.* at 384, 130 S. Ct. at 2262.

The district court determined that Weaver's express waiver as reflected by his signature on the form was not voluntary.[4] We do not

---

[4] The district court also held that Weaver's waiver was not intelligent because he "was never informed of the legal implications of waiving his rights and thus could not have made an informed decision." This finding is incorrect. Weaver was informed of the nature

disagree.    Weaver signed the form under the pretense that it was an acknowledgement that Officer Mittan read his *Miranda* rights to him.  Officer Mittan did not read the waiver section to Weaver, and Weaver did not appear to read the waiver section.    Consequently, Weaver thought he was acknowledging being informed of his rights while the signature, according to the form, represented an express waiver of his rights.  This was deceptive, as Officer Mittan acknowledges, negating the voluntariness of his express waiver.  Although Officer Mittan assures that he was not trying to deceive Weaver, "the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of [the suspect's] election to abandon his rights."  *Moran v. Burbine*, 475 U.S. 412, 423, 106 S. Ct. 1135, 1142 (1986).

The inquiry, however, does not end at express waiver.    Even if Weaver's signed waiver was invalid, he can still implicitly waive his *Miranda* rights.  The Supreme Court holds that although "[a]n express written or oral statement of waiver of the right to remain silent . . . is usually strong proof of the validity of that waiver," it is not "inevitably either necessary or sufficient to establish waiver."  *Butler*, 441 U.S. at 373, 99 S. Ct. at 1757.  The district court neglected to perform an implied waiver analysis, which depends on consideration of all the relevant circumstances of the interview.  Given its fact-specific nature, this court declines to be the first to do so.

We REVERSE the district court's grant of the motion to suppress and REMAND for the court's consideration of whether Weaver implicitly waived his *Miranda* rights.   This panel retains jurisdiction pending the district court's decision on remand.

––––––––––––––––––––––––––––––

of his rights and the consequences of waiving them by the *Miranda* warnings.  *See supra* footnote 2.